# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## CHARLESTON DIVISION

YURI JHOANA GUTIERREZ AROCA,
ARLEY CABRERA VALENZUELA,

                            Petitioners,

v.                                        CIVIL ACTION NO.  2:26-cv-00057

CHRISTOPHER MASON, et al.,

                            Respondents.

## MEMORANDUM OPINION AND ORDER

The husband and wife before this court are charged with civil violations of our country's immigration laws. Civil. Not criminal.[1] That distinction is not a technicality or a formality. It is the line the law draws between regulation and punishment. Yet these two working parents appear in unmistakable prison garb.[2] They wear orange jumpsuits, are shackled, and are restrained in heavy chains. They have been kept away from their children, forced to languish in detention hundreds of miles away from where they live and work. They have been confined for days alongside persons accused of or convicted of crimes. They are held without any custody

---

[1] *See Zadvydas*, 533 U.S. at 690 (characterizing a case concerning a habeas petition challenging immigration detention as "civil, not criminal"); *Vacchio v. Ashcroft*, 404 F.3d 663, 667–68 (2d Cir. 2005) (same).

[2] The Supreme Court has recognized in the criminal context that "[v]isible shackling" may "undermine[ ] the . . . fairness of the factfinding process," interfere with an individual's "ability to communicate with his lawyer," and compromise the "courtroom's formal dignity, which includes the respectful treatment of" all litigants. *Deck v. Missouri*, 544 U.S. 622, 630–32 (2005); *see also Covelli-Chaparro v. Bondi*, No. 2:26-cv-118, --- F. Supp. 3d ---, 2026 WL 118842, at *4 (E.D.N.Y. Jan. 15, 2026) (noting that shackling a habeas petitioner in a civil immigration detention proceeding without any showing of flight risk or dangerousness and without notice to or permission from the court is likely unjustified, and ordering the government to explain ICE's asserted authority to impose restraints in a civil proceeding).

determination or bond hearing. This is not what civil enforcement looks like in a humane system of government under law.

The Constitution does not permit such cruelty as a condition of civil enforcement. It does not permit the government to strip people of dignity simply because they lack lawful status. It has long been settled that noncitizens,[3] "even [those] whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law."[4] The authority the political branches possess over immigration does not include the power to seize liberty first and justify confinement later. Due process is not a courtesy extended at the government's convenience. Due process is the condition that makes custody lawful in the first place. Congress itself has recognized this principle by requiring that civil immigration detention be tethered to a lawful custody determination—one that determines whether continued detention is warranted or whether release on bond is appropriate.[5] When liberty is restrained without a meaningful opportunity to be heard, the Constitution's promise is not delayed. It is denied.

I am not blind to the practical demands of immigration enforcement, including cooperation between state and federal authorities. But the Constitution presupposes restraint as the default of lawful authority. Stops conducted on the highway without articulable and reasonable suspicion, followed by civil detention carried out in a manner indistinguishable from criminal punishment collapses the very distinction the law insists upon.[6] What is plainly missing here is restraint.

---

[3] This Memorandum Opinion uses the term "noncitizen" as equivalent to the statutory term "alien." *Nasrallah v. Barr*, 590 U.S. 573, 578, n.2 (2020); *see* 8 U.S.C. § 1101(a)(3) ("The term 'alien' means any person not a citizen or national of the United States.").

[4] *Plyler v. Doe*, 457 U.S. 202, 210 (1982).

[5] *See* 8 U.S.C. § 1226.

[6] *Larrazabal-Gonzalez v. Mason*, No. 2:26-cv-00049, --- F. Supp. 3d ---, 2026 WL 221706, at *4 (S.D. W. Va. Jan. 28, 2026) ("When the Government confines a person, it must be prepared—when called upon—to show who seized him, why, how, and under what authority."); *Briceno Solano v. Mason*, No. 2:26-cv-00045, --- F. Supp. 3d ---, 2026 WL 311624, at *1 (S.D. W. Va. Feb. 4, 2026) ("If the government may simply seize *someone* without due process, there is no check on its ability to seize *anyone*.").

Without restraint, enforcement becomes arbitrary and unlawful. Courts exist to prevent that collapse.

The structure of the Constitution assumes a government strong enough to enforce the law, but most importantly, restrained enough to remember the humanity of the people subject to it. A system confident in its authority does not need shackles and chains. A just system does not jail civil detainees for days without process and call that order. The Constitution was written to cover even the most difficult cases. It forbids shortcuts. This case arises against that backdrop.

Petitioners Yuri Jhoana Gutierrez Aroca ("Petitioner Aroca") and Arley Cabrera Valenzuela ("Petitioner Valenzuela") seek relief through a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. 2241, [ECF No. 1].[7] They challenge their continued detention without the process the law requires. They are not alone. They are just two of many people arrested and detained by Immigration Customs and Enforcement ("ICE") officers in the last several weeks while travelling on the roads of this State.[8] This young man and young woman have been charged with no crimes, have no outstanding warrants for their arrest, are not members of dangerous gangs, and pose no asserted security threat to the United States.[9] They are long-time residents and workers who were lawfully released on their own recognizance pending adjudication of their asylum applications. They have appeared at every required proceeding.

---

[7] The Petition identifies Christopher Mason, Superintendent of SCRJ, as a respondent, as well as Michael Rose, Acting Field Office Director of the Philadelphia Field Office of ICE; Todd Lyons, Acting Director of ICE; Kristi Noem, Secretary of Homeland Security; and Pamela Bondi, the United States Attorney General (collectively, the "Government").

[8] See e.g., *Briceno Solano*, 2026 WL 311624, at *3 (detained on January 11, 2026); *Larrazabal-Gonzalez*, 2026 WL 221706, at *2 (detained on January 13, 2026); *Flores v. Mason*, No. 2:26-cv-00044, 2026 WL 227010, at *1 (S.D. W. Va. Jan. 28, 2026) (detained January 13, 2026); *Mehari v. Mason*, No. 2:26- cv-00039, 2026 WL 316034, at *1 (S.D. W. Va. Feb. 5, 2026) (detained January 13, 2026); *Simanca Gonzalez v. Aldridge*, No. 3:26-cv-00055, 2026 WL 313476, at *1 (S.D. W. Va. Feb. 5, 2026) (detained January 18, 2026).

[9] At the hearing, the Government conceded that it possessed no information suggesting that Petitioners posed a risk to national security, maintaining only that such questions are for the immigration court to address. *See also* [ECF No. 27, at 3].

At bottom, this case turns on a simple but fundamental principle. In a government of laws, words matter. Statutes derive their authority from the language Congress enacted and not from the government's improper efforts to expand that language to justify detention without process.[10] Because the Government's actions here find no support in the statutory text and violate the core demands of due process, the pending Petition for Writ of Habeas Corpus, [**ECF No. 1**], is **GRANTED**, and the Government's Motion to Dismiss, [**ECF No. 19-1**], is **DENIED**.[11]

## I.    BACKGROUND

The parties do not dispute the material facts relevant to this matter. Accordingly, I recite them as set forth in the parties' briefing, the attached exhibits, and as represented in court during the show cause hearing.

### A.  Petitioner Yuri Jhoana Gutierrez Aroca

Border Patrol agents first encountered Petitioner Aroca on November 24, 2023, in the San Diego, California area. [ECF No. 19-2]. During that encounter, the agents determined that she had entered the United States from Mexico without inspection. *Id.* She was arrested and transported to the Campo Border Patrol Sector Processing Center for further processing. *Id.*

At the processing center, an immigration official advised Petitioner Aroca of her administrative rights, which she acknowledged and stated that she understood. *Id.* She also acknowledged that she is a citizen and national of Colombia and confirmed that she lacked valid entry documents. *Id.* A biometric identification check through the Automated Biometric Identification System ("ABIS"), along with additional records checks, verified her identity and

---

[10] *See King v. Burwell*, 576 U.S. 473, 515 (2015) (Scalia, J., dissenting) ("[O]urs is a government of laws and not of men. That means we are governed by the terms of our laws, not by the unenacted will of our lawmakers."); *Lamie v. U.S. Tr.*, 540 U.S. 526, 542 (2004) ("If Congress enacted into law something different from what it intended, then it should amend the statute to conform to its intent.").

[11] Also pending is the Government's Motion to Exceed Page Limit, [ECF No. 19], and Petitioners' Motion to Exceed Page Limit for Reply, [ECF No. 24]. For good cause shown, the motions, [**ECF Nos. 19, 24**], are **GRANTED**.

confirmed that no lawful basis existed for her entry into the United States. *Id.*

Due to a lack of available bed space at the detention center, Border Patrol released Petitioner Aroca on an Order of Release of Recognizance (Form I-220A).[12] *Id.* at 3. At the time of her release, Petitioner Aroca was also served with a Warrant for Arrest of Alien (Form I-200),[13] a Notice of Custody Determination (Form I-286),[14] Notice to Appear (Form I-862),[15] and a list of free legal service providers. *Id.* The Notice to Appear directed Petitioner Aroca to appear before an Immigration Judge in Cleveland, Ohio, on October 28, 2025, to show cause why she should not be removed from the United States based on the charges listed therein. [ECF No. 19-3]. Petitioner Aroca signed the Notice on November 25, 2023, acknowledging personal service, *Id.* at 2, and attended the scheduled hearing as directed.[16]

After being lawfully released in the United States, Petitioner Aroca obtained an Employment Authorization Document ("EAD")[17] and filed an application for asylum (Form I-

---

[12] An Order of Release of Recognizance (Form I-220A) is an official order issued by an authorized immigration officer "[i]n accordance with section 236 of the Immigration and Nationality Act [(8 U.S.C. § 1226]) and the applicable provisions of Title 8 of the Code of Federal Regulations." It permits a noncitizen to be released from custody without payment of a bond, based on the individual's written promise to appear at all immigration proceedings and to comply with specified conditions, such as regular reporting, notification of any change of address, and refraining from committing new crimes.

[13] A Warrant for Arrest of Alien (Form I-200) is an administrative document issued by the Department of Homeland Security ("DHS") to ICE. It authorizes ICE to arrest a noncitizen suspected of violating immigration law. Unlike a judicial arrest warrant, which is issued by a court after a neutral decisionmaker's finding of probable cause, the Form I-200 is issued by ICE or other DHS officials and does not require judicial oversight.

[14] The Notice of Custody Determination (Form I-286) memorializes DHS's initial custody decision for a noncitizen taken into immigration custody under 8 U.S.C. § 1226. The form advises whether DHS has determined that the individual will be detained, released on recognizance, or released on bond and, if applicable, sets the bond amount and informs the individual of the right to seek review of that determination.

[15] A Notice of Hearing (Form I-862) is the administrative document used to provide the written "notice to appear" required by 8 U.S.C. § 1229(a) to initiate removal proceedings. Proceedings officially begin when the form is filed with the Immigration Court, though DHS issues it at the time of arrest.

[16] Petitioners' counsel stated at the show cause hearing that Petitioner Aroca attended all immigration hearings as directed, without objection from the Government. The court received no information regarding the outcome of any immigration proceeding.

[17] An EAD, requested through Form I-765, is a work permit that authorizes certain noncitizens such as asylum seekers to be employed legally in the United States. It is distinct from immigration status and requires periodic renewal. If approved, a Form I-766 EAD card is issued, serving as official proof of employment authorization. *See also* 8 U.S.C. § 1324a; 8 C.F.R. § 274a.12; 8 C.F.R. § 274a.13.

589).[18] [ECF No. 19-7; ECF No. 1, ¶ 15]. She secured part-time employment at a food truck in Columbus, Ohio, where she lives and cares for her three minor children.

On January 6, 2026, the Executive Office for Immigration Review ("EOIR") mailed Petitioner Aroca a Notice of In-Person Hearing. [ECF No. 19-8]. The notice scheduled her next immigration hearing for March 17, 2026, in Cleveland, Ohio. *Id.* at 1.

### B. Petitioner Arley Cabrera Valenzuela

Border Patrol agents first encountered Petitioner Valenzuela on August 27, 2023, in the San Diego, California area. [ECF No. 27]. During that encounter, the agents determined that he had entered the United States from Mexico without inspection. *Id.* at 2. Petitioner Valenzuela was arrested and transported to a processing center for further handling. *Id.*

At the processing center, an immigration official advised Petitioner Valenzuela of his administrative rights, which he acknowledged and stated that he understood. *Id.* Petitioner Valenzuela also acknowledged that he is a citizen and national of Colombia and confirmed that he lacked valid entry documents. *Id.* An ABIS check, along with additional records checks, verified his identity and confirmed that no lawful basis existed for his entry into the United States. *Id.* at 1.

On August 29, 2023, Petitioner Valenzuela was released on an Order of Release of Recognizance (Form I-220A). [ECF No. 19-5]. Petitioner Valenzuela was served a Notice to Appear (Form I-862), Notice of Custody Determination (Form I-286), a Change of

---

[18] An Application for Asylum Application for Asylum and for Withholding of Removal (Form I-589) is used by noncitizens physically present in the United States to request asylum, which provides legal protection and a path to residency if they fear persecution based on race, religion, nationality, political opinion, or social group. Approval grants asylum status, work authorization, and certain derivative benefits, while a denial may result in removal proceedings. *See* 8 U.S.C. § 1158. The United States is obligated to provide asylum under the 1967 Protocol Relating to the Status of Refugees, which extended the protections of the 1951 Refugee Convention beyond Europe and removed temporal limitations on refugee status. This Protocol was incorporated into U.S. law through the Refugee Act of 1980, which established the modern asylum system. Under Article VI of the U.S. Constitution, ratified treaties are the supreme law of the land, creating a constitutional obligation to provide asylum consistent with the Protocol's protections.

Address/Contact Information form (Form EOIR-33), and a list of free legal service providers. *Id.* The Notice to Appear directed Petitioner Valenzuela to appear before an Immigration Judge in Cleveland, Ohio, on February 29, 2024, to show cause why he should not be removed from the United States based on the charges listed therein. [ECF No. 19-6]. Petitioner Valenzuela signed the Notice on August 29, 2023, acknowledging the conditions of his release, *Id.* at 2, and attended the scheduled hearing as directed.[19]

After being lawfully released in the United States, Petitioner Valenzuela obtained a work authorization and filed an application for asylum. [ECF No. 1, ¶ 15]. He resides in Columbus, Ohio, with his wife and three minor children. He is employed by Aramark, a private contractor providing services for correctional facilities.

### C.  January 18, 2026 Stop in Pax, West Virginia

On January 18, 2026, the West Virginia State Police conducted a traffic stop in Pax, West Virginia, along Interstate 77. [ECF No. 19-7]. The driver was identified as Petitioner Valenzuela, and the passenger as Petitioner Aroca. *Id.* Following the stop, ICE agents arrived to assist, interviewed the Petitioners, and conducted records checks. *Id.* Based on the interviews and the results of those checks, ICE agents concluded that probable cause existed to believe both Petitioners lacked lawful status and were subject to removal. *Id.* Petitioners were arrested and transported to South Central Regional Jail ("SCRJ") in Charleston, West Virginia, where they remain confined. [ECF No. 1, ¶ 8].

Notably, the record contains no information regarding the justification for the initial traffic stop conducted by the West Virginia State Police. At the show cause hearing, Petitioners' counsel

---

[19] Petitioners' counsel stated at the show cause hearing that Petitioner Valenzuela attended all immigration hearings as directed, without objection from the Government. The court received no information regarding the outcome of any immigration proceeding.

proffered that the Petitioners believed they had been stopped solely because of their appearance. *Id.* The Government offered no evidence or statement to the contrary.[20]

### D. Petition for Writ of Habeas Corpus

On January 27, 2026, Petitioners initiated this habeas action pursuant to 28 U.S.C. § 2241. [ECF No. 1]. Petitioners argue that their continued detention violates multiple constitutional, statutory, and regulatory protections, including the Fifth Amendment's Due Process and Equal Protection Clauses, the Immigration and Nationality Act ("INA") and its implementing regulations, the Administrative Procedure Act ("APA"), and the Suspension Clause of the United States Constitution. *See id.* ¶¶ 37–44, 46–48, 50–56, 58–60, 62–67. They assert that, as noncitizens residing in the United States at the time of apprehension, their detention is governed by the discretionary procedures of 8 U.S.C. § 1226(a). *Id.* ¶ 52. Petitioners seek immediate release from custody, or in the alternative, an order directing the Government to provide them with a bond hearing before a neutral Immigration Judge. *Id.* at 16.

In response, the Government contends that the court lacks subject matter jurisdiction and that Petitioners' detention is mandatory under 8 U.S.C. § 1225(b)(2)(A). [ECF No. 19-1, at 2]. It has accordingly moved to dismiss the Petition. *Id.* I address each argument below.

## II.    LEGAL STANDARD

"[H]abeas corpus is a broad, independent writ designed to address challenges to any illegal custody," *Wall v. Kiser*, 21 F.4th 266, 273 (4th Cir. 2021), including those "by executive direction," *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973). The "heart of habeas corpus" is the

---

[20] "The Fourth Amendment requires that immigration stops must be based on reasonable suspicion of illegal presence, stops must be brief, arrests must be based on probable cause, and officers must not employ excessive force. Moreover, the officers must not make interior immigration stops or arrests based on race or ethnicity." *Trump v. Illinois*, 607 U.S. ---, 146 S. Ct. 432, 436 n.4 (2025) (Kavanaugh, J., concurring) (citing *Whren v. United States*, 517 U.S. 806, 813 (1996) ("[T]he Constitution prohibits selective enforcement of the law based on considerations such as race")).

challenge to a petitioner's confinement (or the duration of his confinement), where he seeks "immediate release or a speedier release from that confinement." *Preiser*, 411 U.S. at 498. The Constitution guarantees that the writ of habeas corpus is "available to every individual detained within the United States." *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004). Accordingly, noncitizens may invoke habeas in immigration-related matters where no other statutory mechanism for review is provided. *See Zadvydas v. Davis*, 533 U.S. 678, 687–88 (2001). Indeed, challenges to present immigration confinement "fall within the 'core' of the writ of habeas corpus." *Trump v. J. G. G.*, 604 U.S. 670, 672 (2025) (quoting *Nance v. Ward*, 597 U.S. 159, 167 (2022))

28 U.S.C. § 2241 confers federal district courts "within their respective jurisdictions" the authority to hear applications for habeas corpus by any person who claims to be held "in custody in violation of the Constitution or laws or treaties of the United States . . . ." *Id.* §§ 2241(a), (c). After receiving the petition and any response thereto, "[t]he court shall summarily hear and determine the facts, and dispose of the matter as law and justice require." 28 U.S.C. § 2243. The petitioner bears the burden of proving that he is being held contrary to law by a preponderance of the evidence. *Walker v. Johnston*, 312 U.S. 275, 286 (1941) ("On a hearing, [the § 2241 petitioner has] the burden of sustaining his allegations by a preponderance of evidence."); *Parke v. Raley*, 506 U.S. 20, 31 (1992); *Sumner v. Mata*, 449 U.S. 539, 551 (1981).

## III.    DISCUSSION

This case presents a dispute that has arisen with increasing frequency in immigration litigation: whether Petitioners' detention is governed by the mandatory detention provision of 8 U.S.C. § 1225(b)(2)(A) or the discretionary detention provision of 8 U.S.C. § 1226(a). Petitioners contend that § 1226 applies, entitling them to an *ex ante* release determination and bond hearing. [ECF No. 1, ¶ 75]. The Government, however, insists that Petitioners are detained under § 1225,

precluding any possibility of bond. [ECF No. 19-1, at 27]. That disagreement forms the axis around which Petitioners' claims revolve.

I note that several courts across the country, including in this district, have confronted this issue recently. Judicial responses have been remarkably consistent: the Government's arguments have been repeatedly rejected as incompatible with established law.[21] Yet the Government continues to advance them here. Given the recurring nature of these disputes, I undertake a careful exposition of the law, not only to resolve the matter presently before the court, but also to provide guidance that may conserve judicial resources in future cases and safeguard similarly situated petitioners going forward.

I now turn to the parties' arguments, starting with the Government's contention that this court lacks subject matter jurisdiction.

## A. Jurisdiction

The Government argues that the court lacks jurisdiction to consider the Petition on two independent grounds: "(1) 8 U.S.C. §1252(b)(9), which limits judicial review of questions of law and fact arising from removal proceedings to courts of appeal, and (2) 8 U.S.C. §1252(g), which

---

[21] *Han v. Noem*, No. 25-CV-10753, 2026 WL 322963, at *4 n.2 (S.D.N.Y Feb. 6, 2026) ("Since Respondents' change in position, a growing number of courts across the country have confronted the statutory question of whether § 1225 also mandates the detention of noncitizens who are physically present and already living in the United States. In response to this question, an overwhelming majority of opinions in this District and others across the country have held that § 1226, not § 1225, governs the process of arresting and detaining noncitizens who are already present in the United States." (collecting cases)); *id.* at *4, n.2 ("Since ICE's policy change approximately seven months ago, hundreds of courts have struck down the Government's attempts to mandatorily detain immigrants who are already present in the United States. . . .Yet Respondents daily continue detaining noncitizens at routine check-ins and immigration court hearings without any process, in direct contravention of the overwhelming majority position across the nation. In doing so, ICE appears to seek to intimidate the millions of immigrants residing in the U.S. who have been attending their scheduled check-ins while litigating their pending immigration cases . . . ."); *Gonzalez*, 2026 WL 313476, at *5 (Chambers, J.) ("Petitioner's interpretation is consistent with the overwhelming majority of district court decisions rendering similar mandatory, unreviewed detentions of long-term resident noncitizens without criminal records to be within the purview of 8 U.S.C. § 1226(a)." (collecting cases)); *Yao v. Almodovar*, No. 25-CV-9982, 2025 WL 3653433, at *3, *8 (S.D.N.Y. Dec. 17, 2025) ("[M]ore than 160 federal district judges in some 50 districts across the country have addressed these questions in more than 350 cases presenting like facts," and "more than 350 decisions . . . have now rejected ICE's reading.").

bars district court review of decisions by the Attorney General to commence removal proceedings." [ECF No. 19-1, at 2]. I disagree.

### 1.  8 U.S.C. § 1252(b)(9)

Section 1252(b)(9) provides that "judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, *arising from any action taken or proceeding brought to remove an alien from the United States* under this subchapter shall be available only in judicial review of a final order under this section." 8 U.S.C. § 1252(b)(9). Notably, § 1252(b)(9) applies only "[w]ith respect to review of an order of removal." *See Casa De Maryland v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 697 (4th Cir. 2019). The Supreme Court has cautioned against an overinclusive interpretation of § 1252(b)(9)'s jurisdictional bar:

> [T]he applicability of § 1252(b)(9) turns on whether the legal questions that [the court] must decide 'aris[e] from' the actions taken to remove these aliens. It may be argued that this is so in the sense that if those actions had never been taken, the aliens would not be in custody at all. But this expansive interpretation of § 1252(b)(9) would lead to staggering results.

*Jennings v. Rodriguez*, 583 U.S. 281, 293 (2018) (plurality opinion).[22] Where a petitioner is "not asking for review of an order of removal," "challenging the decision to detain them in the first place or to seek removal," or "challenging any part of the process by which their removability will be determined," "§ 1252(b)(9) does not present a jurisdictional bar." *Id.* at 294–95; *see also Hasan*

---

[22] The holding of a case in which there was no majority opinion "'may be viewed as th[e] position taken by those Members who concurred in the judgments on the narrowest grounds.'" *Marks v. United States*, 430 U.S. 188, 193 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n. 15 (1976)). In *Jennings v. Rodriguez*, the petitioner, a lawful permanent resident who had been convicted of a felony, was detained under 8 U.S.C. § 1226 during removal proceedings and filed a habeas petition seeking a bond hearing. 583 U.S. at 289–90. Amongst other issues, the Court was asked to address whether 8 U.S.C. § 1252(b)(9) stripped it of jurisdiction over the habeas challenge. 583 U.S. at 291–92. "[A] majority of the Court" concluded it "ha[d] jurisdiction." *Id.* at 314 (Thomas, J., concurring). Three dissenting justices concluded that § 1252(b)(9) "applies only 'with respect to review of an order of removal under § 1252(a)(1).'" *Id.* at 355 (Breyer, J., dissenting). The three-justice plurality took a narrower view, holding because the respondents were not "asking for review of an order of removal," "challenging the decision to detain" them "in the first place or to seek removal," or "challenging any part of the process by which their removability will be determined," the jurisdiction strip did not apply. *Id.* at 294 (plurality opinion). Under *Marks*, the plurality's narrower rationale controls. 430 U.S. at 193.

*v. Crawford*, 800 F. Supp. 3d 641, 650 (E.D. Va. Sept. 19, 2025) ("Section 1252(b)(9) does not insulate detention orders from judicial review because they are 'separate and apart from' orders of removal." (quoting 8 C.F.R. § 1003.19(d))).[23]

Here, Petitioners plainly do not challenge the decision to detain them or seek removal, or any part of the process by which their removability will be determined. [*See* ECF No. 1, ¶ 14 (acknowledging that Petitioners "are subject to civil immigration custody")]. Nor do they ask the court to review an order of removal order, as no such order has yet been entered against them. [*See* ECF No. 24-1, at 3 (noting that "removal proceedings had commenced *years* before the unlawful detention at issue," and that "Petitioners here do not challenge the government's authority to adjudicate their cases or execute any hypothetical future removal orders.")]. Petitioners contest only the misapplication of § 1225 to their detention and the resulting denial of their right to seek bond under § 1226. *See Briceno Solano*, 2026 WL 311624, at *7 ("Indeed, the question of whether Petitioner is being improperly held without bond under § 1225(b)(2) is identical to one of the claims brought in *Jennings* itself.").[24]

### 2.  8 U.S.C. § 1252(g)

Section 1252(g) prohibits judicial review of any claim "arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders

---

[23] 8 C.F.R. § 1003.19(d), the implementing regulation for the INA's provisions regarding custody determinations and bond hearings for noncitizens in removal proceedings, provides that "Consideration by the Immigration Judge of an application or request of a respondent regarding custody or bond under this section shall be separate and apart from, and shall form no part of, any deportation or removal hearing or proceeding."

[24] The Government further argues that "[r]ead in conjunction with section 1252(b)(9), section 1252(a)(5) expresses Congress's intent to channel and consolidate judicial review of every aspect of removal proceedings into the petition-for-review process in the courts of appeals." [ECF No. 19-1, at 9]. Section 1225(a)(5), however, makes clear that "[n]otwithstanding any other provision of law (statutory or nonstatutory), including [8 U.S.C. § 2241], or any other habeas corpus provision, and [28 U.S.C. §§ 1361 and 1651], a petition for review filed with an appropriate court of appeals . . . shall be the sole and exclusive means for judicial review of an order of removal entered or issued . . . ." Because Petitioners here are not seeking review of any order of removal that has been entered or issued, § 1252(a)(5) does not deprive the court of jurisdiction.

. . . ." The Supreme Court has interpreted § 1252(g)'s jurisdiction-stripping provision narrowly, limiting it to only "three discrete actions": the "'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" *Reno v. Am.-Arab Anti-Discrimination Comm.* ("*AADC*"), 525 U.S. 471, 482 (1999) (quoting 8 U.S.C. § 1252(g)). The Supreme Court rejected any reading of the statute that would cover "the universe of deportation claims," *id.*, and cautioned against interpreting § 1252(g) with "uncritical literalism" to sweep in any claim that can technically be said to "arise from" these three actions, *Jennings*, 583 U.S. at 293–95. Section 1252(g) is aimed at preventing judicial constraints on prosecutorial discretion, not general challenges to detention. *AADC*, 525 U.S. at 485 n.9. Petitioners here challenge only their present detention, not the commencement of proceedings, the adjudication of their removal cases, or the execution of any removal order.

### 3. Exhaustion

The Government's position on exhaustion—that Petitioners must first request a bond hearing from an immigration judge—is legally flawed. The Government identifies no exhaustion provision in either 8 U.S.C. §§ 1225 or 1226, nor can I find one. *See McCarthy v. Madigan*, 503 U.S. 140, 144 (1992) ("Where Congress specifically mandates" exhaustion of administrative remedies, "exhaustion is required."). "[W]here Congress has not clearly required exhaustion, sound judicial discretion governs." *Id.*; *see also Miranda v. Garland*, 34 F.4th 338, 351 (4th Cir. 2022) (recognizing that in the absence of a statutory exhaustion provision, "the district court [has] discretion to decide if administrative exhaustion [is] required"). The Government does not explicitly dispute this principle, yet it effectively asks the court to exercise discretion to enforce a remedy that has no practical effect.

When left to the court's discretion, exhaustion may be excused when "the legal question is

'fit' for resolution and delay means hardship . . . or when exhaustion would prove 'futile[.]'" *Shalala v. Ill. Council on Long Term Care*, 529 U.S. 1, 13 (2000) (citations omitted). Exhaustion may be futile, for example, when "an administrative remedy may be inadequate where the administrative body is shown to be biased or has otherwise predetermined the issue before it." *See id.* at 148.

Under the Government's framework, Petitioners would be required to request a bond hearing before an immigration judge. But the Board of Immigration Appeals ("BIA") has already held that immigration judges lack authority to grant bond to the class of noncitizens that includes Petitioners. *Matter of Yajure Hurtado*, 29 I&N Dec. 216 (BIA 2025).[25] Requiring Petitioners to pursue an administrative remedy that cannot provide relief would be futile. Their detention would continue, and they would find no remedy in front of an immigration judge. I decline to require this kind of futile exhaustion.[26]

### 4. Suspension Clause

The Government's position on jurisdiction reflects an even more troubling misinterpretation of the law. The Great Writ, the power of habeas corpus, has not been suspended nor is it suspended by statute.[27]

The writ of habeas corpus "provide[s] a means of contesting the lawfulness of restraint and

---

[25] In *Matter of Yajure Hurtado*, 29 I&N Dec. 216, 225 (BIA 2025), the BIA held that "under a plain language reading of section 235(b)(2)(A) of the INA, 8 U.S.C. § 1225(b)(2)(A), Immigration Judges lack authority to hear bond requests or to grant bond to aliens . . . who are present in the United States without admission."

[26] *Simanca Gonzalez*, 2026 WL 313476, at *3 ("A court may waive the exhaustion requirement in the circumstance where an administrative body has predetermined the issue before it."); *Briceno Solano*, 2026 WL 311624, at *8 ("Consequently, any attempt by Petitioner to exhaust his administrative remedies would be futile, and exhaustion is excused.").

[27] The Suspension Clause provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const. art. I § 9, cl. 2. "The Clause protects the rights of the detained by a means consistent with the essential design of the Constitution. It ensures that, except during periods of formal suspension, the Judiciary will have a time-tested device, the writ, to maintain the 'delicate balance of governance' that is itself the surest safeguard of liberty." *Boumediene v. Bush*, 553 U.S. 723, 745 (2008).

securing release." *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 117 (2020). At its core, "the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." *INS v. St. Cyr*, 533 U.S. 289, 301 (2001), *superseded by statute on other grounds*, The REAL ID Act of 2005, Pub. L. No. 109-12, 119 Stat. 310, 8 U.S.C. § 1252(a)(5), *as recognized in*, *Nasrallah v. Barr*, 590 U.S. 573 (2020).[28] While its origins lie in historical English common law, Congress codified the writ in federal statute: "Writs of habeas corpus may be granted by . . . district courts . . . within their respective jurisdictions." 28 U.S.C. § 2241; *see also Rasul v. Bush*, 542 U.S. 466, 473–74 (2004) ("The writ appeared in English law several centuries ago, became an integral part of our common-law heritage by the time the Colonies achieved independence, and received explicit recognition in the Constitution." (citation modified)).

Nevertheless, the Government persists in this district in asserting that Article III district court judges lack authority to hear habeas challenges from petitioners asserting constitutional violations. When pushed to justify this paradox, the Government retreats to provisions of the immigration code as if it supersedes the Constitution itself.[29] It cannot. At best, the Government's argument is illogical.[30] At worst, it undermines the judiciary's role as an independent branch of

---

[28] "[The REAL ID Act] responded to [the] Court's 2001 decision in [*INS v. St. Cyr*, 533 U.S. 289 (2001)]. In *St. Cyr*, [the] Court ruled that the 1996 Act, although purporting to eliminate district court review of final orders of removal, did not eliminate district court review via habeas corpus of constitutional or legal challenges to final orders of removal. The REAL ID Act clarified that final orders of removal may not be reviewed in district courts, even via habeas corpus, and may be reviewed only in the courts of appeals." *Nasrallah*, 590 U.S. at 580 (citations omitted). As explained, *see supra* note 24, because Petitioners here do not challenge a final removal order, these amendments enacted by the REAL ID Act are inapplicable.

[29] *Larrazabal-Gonzalez v. Mason*, No. 2:26-cv-00049, [ECF No. 21] (S.D. W. Va. Jan. 27, 2026) (show cause hearing in front of Judge Joseph R. Goodwin); *Briceno Solano v. Mason*, No. 2:26-cv-00045, [ECF No. 22] (S.D. W. Va. Jan. 28, 2026) (show cause hearing in front of Judge Thomas E. Johnston); *Umarov v. Mason*, No. 2:26-cv-00081, [ECF No. 25] (S.D. W. Va. Feb. 6, 2026) (show cause hearing in front of Judge Irene C. Berger); *Simanca Gonzales v. Aldridge*, No. 3:26-cv-00055, [ECF No. 19] (S.D. W. Va. Feb. 3, 2026) (show cause hearing in front of Judge Robert C. Chambers).

[30] *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004) ("[T]he writ of habeas corpus remains available to every individual detained within the United States.").

government. *Boumediene v. Bush*, 553 U.S. 723, 743 (2008) ("[T]he Framers deemed the writ to be an essential mechanism in the separation-of-powers scheme.").

"When English monarchs jailed their subjects summarily and indefinitely, common-law courts employed the writ as a way to compel the crown to explain its actions—and, if necessary, ensure adequate process." *Brown v. Davenport*, 596 U.S. 118, 128 (2022). We are no longer governed by a monarchy. Instead, the Executive branch now asserts the power to arrest and detain individuals, asserting that federal courts cannot review those actions. This claim is both legally and historically incorrect. The writ, "the instrument by which due process [can] be insisted upon," ensures the power of the federal courts and the rights of due process held by every individual in the United States. *Hamdi v. Rumsfeld*, 542 U.S. 507, 555 (2004) (Scalia, J., dissenting).

Accordingly, I find that the Suspension Clause grants this court, and every court, jurisdiction to hear habeas challenges to continued detention of those unlawfully detained.[31]

## B. Applicable Statute

Having determined this court has jurisdiction over the Petition, I must now determine whether Petitioners' detention is governed by the mandatory detention provisions of 8 U.S.C. § 1225(b)(2) or the discretionary detention provisions of 8 U.S.C. § 1226(a). The distinction between

---

[31] Because I find that none of the provisions of the INA bar this court from exercising jurisdiction, I need not decide whether the jurisdictional provisions violate the Suspension Clause. Nonetheless, the thorough and well-reasoned opinion in *Briceno Solano v. Mason* is persuasive. 2026 WL 311624, at *9 (employing a "two-step analysis to determine whether a jurisdiction-stripping statute violates the Suspension Clause" and a petitioner may invoke the Suspension Clause). Here, Petitioners may properly invoke the Suspension Clause. Other than a highway-side determination, the Petitioners have not received due process. *Id.* (one factor to consider is the process giving to a petitioner). Petitioners are "part of a national community" and have "developed sufficient connection with this country to be considered part of that community." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990) (considering who "the people" refer to in the Fourth Amendment and who may invoke certain protections). The Government detained Petitioners in the interior United States, and there are no practical barriers to granting the writ. *Briceno Solano*, 2026 WL 311624, at *9 (two other factors include site of arrest and detention and obstacles to habeas relief). Lastly, Petitioners have no adequate alternative to a habeas challenge because the Government believes that Petitioners must be detained indefinitely or until removal proceedings begin. *Id.* at *9 (considering the alternatives to habeas relief). But any continued detention, as I address more fully later, is unlawful. Therefore, Petitioners may properly invoke the Suspension Clause, and this court has jurisdiction.

these two statutory provisions is critical, as they carry markedly different requirements and procedural protections.

The dispute here centers on § 1225(b)(2)(A) and, in particular, the meaning and function of the phrase "seeking admission." The core issue is whether that phrase limits the sweep of persons subject to mandatory detention under the statute, or whether it merely restates the category of "applicant for admission" as defined by § 1225(a)(1) and reproduced in § 1225(b)(2)(A)'s opening clause. Consistent with the statutory definition of "admission," the provision's context, the Supreme Court's understanding of the statutory scheme, and the broader history of American immigration law, "seeking admission" means what it says: actively seeking to enter the United States.

### 1. 8 U.S.C. 1225(b)(2)

Section 1225 applies to "applicant[s] for admission," defined as "[a]n alien present in the United States who has not been admitted or who arrives in the United States." 8 U.S.C. § 1225(a)(1). Detention of such an individual is mandatory "if the examining immigration officer determines that an alien *seeking admission* is not clearly and beyond a doubt entitled to be admitted." *Id.* § 1225(b)(2)(A) (emphasis added).

Section 1225(b)(2) thus mandates detention only for those noncitizens who are *both* "applicant[s] for admission," and "seeking admission." That mandate is subject only to limited statutory exceptions for "urgent humanitarian reasons or significant public benefit," 8 U.S.C. § 1182(d)(5)(A), which "shall not be regarded as an admission of the alien." *Jennings*, 583 U.S. at 288.

### 2. 8 U.S.C. § 1226(a)

Section 1226, by contrast, is the "default rule" for detaining noncitizens "already present

in the United States" and eligible for removal. *Jennings*, 583 U.S. at 303 ("As noted, § 1226 applies to aliens already present in the United States."); *see id.* at 288 ("[O]nce inside the United States, aliens do not have an absolute right to remain here. . . . Section 1226 generally governs the process of arresting and detaining that group of aliens pending their removal."); *see also Johnson v. Arteaga-Martinez*, 596 U.S. 573, 579 (2022) ("[Section] 1226(a) . . . governs the detention of certain noncitizens present in the country who were inadmissible at the time of entry or who have been convicted of certain criminal offenses since they were admitted."); *Johnson v. Guzman Chavez*, 594 U.S. 523, 543 (2021).

Under § 1226(a), a noncitizen may be arrested pursuant to a warrant and, while removal proceedings are pending, detained, released on bond, or released on conditional parole. 8 U.S.C. § 1226(a). Congress has carved out limited exceptions to this discretionary framework, most notably § 1226(c), which—following amendment by the Laken Riley Act, Pub. L. No. 119-1, 139 Stat. 3 (2025)—requires mandatory detention for certain enumerated categories of noncitizens involving specified criminal offenses and terrorist activities. *See* 8 U.S.C. § 1226(c)(1)(E). Outside those limited circumstances, § 1226(a) entitles a noncitizen to an individualized custody determination and the opportunity to seek release on bond.[32]

---

[32] As explained by the Fourth Circuit,

> The [INA] and the regulations adopted to implement its authority afford aliens three opportunities to seek release from detention. The first opportunity is with an immigration officer. [8 U.S.C. § 1226(a)]. An immigration officer is authorized to release the [noncitizen] if the officer is satisfied that the [noncitizen] is not a danger to the community or a flight risk. 8 C.F.R. § 236.1(c)(8). If the immigration officer decides to release [a noncitizen], the officer may set a bond or place conditions on the [noncitizen's] release. *Id.* If an immigration officer denies bond, sets bond at an amount the [noncitizen] believes is too high or sets alternative conditions to bond the [noncitizen] contends are unreasonable, [a noncitizen] may appeal the officer's bond determination to an immigration judge, giving the [noncitizen] a second opportunity at release. *See* 8 C.F.R. §§ 236.1(d)(1), 1003.19(a), 1236.1(d)(1). A third opportunity comes if [a noncitizen] is not satisfied with the immigration judge's decision. In that situation, [a noncitizen] may appeal to the Board of Immigration Appeals for another review. 8 C.F.R. §§ 236.1(d)(3), 1003.19(f), 1236.1(d)(3).
> . . .

### 3. Basis of Petitioners' Detention

I now decide which of these statutory provisions applies to Petitioners' circumstances. Because the statutory text is clear and unambiguous, the analysis begins—and largely ends—with the language Congress chose.

"The starting point for any issue of statutory interpretation is the language of the statute itself." *United States v. Weaver*, 659 F.3d 353, 356 (4th Cir. 2011) (citation omitted). "It is well established that when the statute's language is plain, the sole function of the courts . . . is to enforce it according to its terms." *Lamie v. U.S. Tr.*, 540 U.S. 526, 534, (2004) (internal quotation marks omitted); *Lee v. Norfolk S. Ry. Co.*, 802 F.3d 626, 631 (4th Cir. 2015) ("If the plain language is unambiguous, [a court] need look no further."). A statute is ambiguous only if it "lends itself to more than one reasonable interpretation," *Lee*, 802 F.3d at 631 (quoting *Newport News Shipbuilding & Dry Dock Co. v. Brown*, 376 F.3d 245, 248 (4th Cir. 2004)). Courts assess "the plainness or ambiguity of statutory language by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Id.* (citation modified).

Critically, "every clause and word . . . should have meaning." *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 432 (2023) (citation modified). That principle applies equally to titles and section headings. *See Dubin v. United States*, 599 U.S. 110, 120–21 (2023). "The title is especially valuable [where] it reinforces what the text's nouns and verbs independently suggest . . . ." *Yates v. United States*, 574 U.S. 528, 552 (2015) (Alito, J., concurring).

---

The first [opportunity], which occurs before an immigration officer, occurs almost immediately upon an alien being detained. The second opportunity for bond, a hearing before an immigration judge, often occurs soon thereafter.

*Miranda v. Garland*, 34 F.4th 338, 346–47, 362 (4th Cir. 2022).

Here, the phrase "seeking admission" is dispositive. It limits § 1225(b)(2)(A)'s reach to noncitizens who are actively trying to gain "lawful entry . . . into the United States after inspection and authorization by an immigration officer." *See* 8 U.S.C. § 1101(a)(13)(A) (defining the terms "admission" and "admitted"); *see also Maldonado de Leon v. Baker*, No. 25-3084-TDC, 2025 WL 2968042, at *7 (D. Md. Oct. 21, 2025). The statutory calculus here is simple: by its terms, § 1225(b)(2)(A) mandates detention only upon satisfaction of three conditions—(1) the individual is an "applicant for admission," (2) the individual is "seeking admission," and (3) the examining officer determines that the individual is not "clearly and beyond a doubt entitled to be admitted." The failure to establish any one of these conditions defeats application of the statute.

At first glance, this structure raises an apparent puzzle, one on which the Government's interpretation largely rests. How can an "applicant for admission" not be "seeking admission"? The answer lies in the statutory definitions and ordinary meaning of the terms. *See Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 585 (1995) (Thomas, J., dissenting) ("[T]he canon that 'we construe a statutory term in accordance with its ordinary or natural meaning' applies only '[i]n the absence of [a statutory] definition.'" (quoting *FDIC v. Meyer*, 510 U.S. 471, 476 (1994)). Section 1225(a) defines an "applicant for admission" as "[a]n alien present in the United States who has not been admitted or who arrives in the United States." 8 U.S.C. § 1225(a)(1). That definition requires no affirmative act at all. Presence without admission suffices, capturing a broad category of noncitizens who may already be physically present within the country.

The statute also defines "admission." "Admission" means "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A). Accordingly, one who is "seeking admission" is seeking "lawful entry" into the

country.[33] The statute does not, however, define the words "seeking" or "entry." I look then at the ordinary meaning of those terms. *Star Athletica, LLC v. Varsity Brands, Inc.*, 580 U.S. 405, 414 (2017) ("We thus begin and end our inquiry with the text, giving each word its ordinary, contemporary, common meaning." (internal quotation marks omitted)); *United States v. Santos*, 553 U.S. 507, 511 (2008) ("When a term is undefined, we give it its ordinary meaning.").

"Seek" is a verb meaning "to go to" or "to try to acquire or gain." *Seek*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/seek (last visited Feb. 8, 2026).[34] In the statute, it appears in its present participle form, "seeking," modifying "alien." A present participle "typically expresses present action in relation to the time expressed by the finite verb in its clause . . . and is used in the formation of the progressive tenses." *Present Participle*, Merriam Webster Online, https://www.merriam-webster.com/dictionary/present%20participle (last visited Feb. 8, 2026); *see also Duarte Escobar v. Noem*, No. 25-cv-1139, 2025 WL 3006742, at *9 (D. Md. Oct. 28, 2025) (explaining that the term "seeking" "implies some sort of present-tense action" (quoting *Martinez v. Garland*, 792 F. Supp. 3d 211, 218 (D. Md. 2024))).[35] Grammatically, "seeking" functions adjectivally, describing the word "alien" in terms of an ongoing action or posture. Semantically, it imposes a temporal and behavioral requirement: the noncitizen must be actively engaged in the act of seeking entry at the time of the officer's determination.

"Entry" commonly means "the act of entering." *Entry*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/entry (last visited Feb. 8, 2026). That understanding

---

[33] *See also Martinez v. Mukasey*, 519 F.3d 532, 544 (5th Cir. 2008) ("Under th[e] statutory definition, 'admission' is the lawful entry of an alien after inspection, something quite different, obviously, from post-entry adjustment of status[.]").

[34] The definition has not changed meaningfully in the 29 years since Congress added the term "seeking admission" to the INA. *See, e.g.*, *Seek*, Merriam-Webster's Collegiate Dictionary (10th ed. 1996) (defining "seek" as "to try to acquire or gain.").

[35] *See also Matter of M-D-C-V-*, 28 I. & N. Dec. 18, 23 (B.I.A. 2020) ("The 'use of the present progressive, like use of the present participle, denotes an ongoing process.'" (quoting *Al Otro Lado v. Wolf*, 952 F.3d 999, 1011–12 (9th Cir. 2020))).

is consistent with the meaning of the term at the time Congress amended the statute in 1996[36] and added a definition of "admission" that incorporated the word "entry." Contemporary dictionaries defined "entry" as "the act of entering" and "entering" as "[t]o come or go in." *See Kashranov v. Jamison*, No. 2:25-cv-05555, 2025 WL 3188399, at *4 (E.D. Pa. Nov. 14, 2025) (first citing *Entry*, Merriam-Webster's Collegiate Dictionary (10th ed. 1996); and then citing *Enter*, Merriam-Webster's Collegiate Dictionary (10th ed. 1996)). In the immigration context specifically, it was defined as "any coming of an alien into the U.S. from a foreign part or place or from an outlying possession, whether voluntary or otherwise." *Id.* (quoting *Entry*, Black's Law Dictionary (6th ed. 1990)).[37]

Read together, the phrase "seeking admission" describes a noncitizen engaged in a present effort to come into the United States. One already present cannot, by definition, be engaged in such an effort.

In short, "seeking admission" imposes an independent limitation on the otherwise broad category of "applicants for admission" rather than merely restating it. Because Petitioners were already present in the United States when detained, they were not "seeking admission," and § 1225(b)(2)(A) therefore does not apply.[38]

The Government's argument improperly treats "applicant for admission" as a self-executing trigger for mandatory detention, untethered from any action. But the INA routinely distinguishes between legal status and operative acts.[39] Largely ignoring this distinction, the

---

[36] Congress added the language at issue when it passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104-208.

[37] *See also Martinez v. Hyde*, No. 25-11909-BEM, --- F. Supp. 3d ---, 2025 WL 3152847, at *8 n.29 (D. Mass. 2025) ("'Admission' is a term of art referring to 'lawful entry.' By contrast, plain 'entry' can be either lawful or unlawful." (citation omitted)).

[38] *See Valverde v. Olson*, No. 25-cv-1502, 2025 WL 3022700, at *3–4 (E.D. Wis. Oct. 29, 2025); *Hyppolite v. Noem*, No. 25-cv-4121, 2025 WL 2829511, at *9 (E.D.N.Y. Oct. 6, 2025).

[39] "[S]tatus and admission . . . are distinct concepts in immigration law: Establishing one does not necessarily establish the other." *Sanchez v. Mayorkas*, 593 U.S. 409, 415 (2021) ("[A] foreign national can be in lawful status but not

Government asserts that all applicants for admission are "inherently and necessarily" seeking admission, such that a noncitizen continues to seek admission merely by remaining present in the United States without lawful entry. [ECF No. 19-1, at 18]. That reading collapses distinct statutory terms into one and cannot be squared with ordinary usage. As a matter of common sense, one who has already entered the country, even unlawfully, cannot be "seeking" to enter it. As one court explained by analogy:

> [S]omeone who enters a movie theater without purchasing a ticket and then proceeds to sit through the first few minutes of a film would not ordinarily then be described as "seeking admission" to the theater. Rather, that person would be described as already present there. Even if that person, after being detected, offered to pay for a ticket, one would not ordinarily describe them as "seeking admission" (or "seeking" "lawful entry") at that point—one would say that they had entered unlawfully but now seek a lawful means of remaining there.

*Lopez Benitez v. Francis*, 795 F. Supp. 3d 475, 489 (S.D.N.Y. 2025).

Accepting the Government's reading would render the phrase "seeking admission" superfluous, violating "one of the most basic . . . canons" of statutory interpretation: "a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . ." *Corley v. United States*, 556 U.S. 303, 314 (2009) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)) (internal brackets omitted). Courts around the country have consistently rejected this approach. *See, e.g.*, *Alvarez Ortiz v. Freden*, No. 25-cv-960, 2025 WL 3085032, at *7 (W.D.N.Y. Nov. 4, 2025) (collecting cases).

The Government further relies on § 1225(a)(3), which provides that "[a]ll aliens . . . who are applicants for admission or otherwise seeking admission or readmission . . . shall be inspected." It argues that the word "otherwise" signals that being an applicant for admission is merely one

---

admitted—think of someone who entered the country unlawfully, but then received asylum."); *see also Hanif v. Att'y Gen.*, 694 F.3d 479, 485 (3d Cir. 2012) (explaining that under the INA, "Congress treated 'admission' as an event or action, while . . . Congress regarded 'lawfully admitted for permanent residence' as an immigration status")

"way or manner" of seeking admission. [ECF No. 19-1, at 18]. This reasoning might carry some weight if the construction referred to the same part of speech—for example, a list of verbs such as "Call, email, or otherwise contact the office." But § 1225(a)(3) does not present a parallel grammatical structure. Instead, it lists the noun "applicants for admission" alongside an adjectival present participle and participial phrase "seeking admission or readmission." The two clauses do not describe alternative methods of the same conduct. Rather, they describe different categories of persons—one defined by legal status, the other by present-tense action.

To make sense of this, the Government invokes a college-application analogy, arguing that a college applicant is necessarily "seeking admission" from the moment their application is submitted. [ECF No. 19-1, at 19].[40] The intuition behind that analogy is understandable. In the ordinary sense, a college applicant is generally defined by what they *do*. They *submit* an application. As *Merriam-Webster* defines it, an "applicant" is "one who applies." *Applicant*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/applicant (last visited Feb. 8, 2026). But the analogy is nonetheless flawed because it misrepresents the statutory distinction between status and action. A student who simply shows up on campus without having submitted an application and sits in the back of class would not be considered a college applicant at all. The INA does not leave the meaning of "applicant for admission" to ordinary usage.

---

[40] This analogy recently persuaded the Fifth Circuit, which departed from the growing consensus of courts and held that all noncitizens who qualify as "applicants for admission" are necessarily "seeking admission" for purposes of § 1225(b)(2)(A), such that mandatory detention applies to all noncitizens present in the United States without having been admitted. *See Buenrostro-Mendez v. Bondi*, Nos. 25-20496, 25-40701, --- F.4th ---, 2026 WL 323330, at *4 (5th Cir. Feb. 6, 2026) ("Just as an applicant to a college seeks admission, an applicant for admission to the United States is 'seeking admission,' to the same regardless of whether the person actively engages in further affirmative acts to gain admission."). That decision is not binding on this court. I find the dissent's reasoning far more persuasive. *See id.* at *12 (Douglas, J., dissenting) ("Combining the ordinary meaning of 'seeking' with the statutory definition of 'admission,' there is no need to resort to strained analogies with the college admissions process to determine the meaning of key statutory terms governing detention."); *id.* at *18 ("Nothing less was required to upend this country's historic immigration practices based on the idea that college applicants necessarily seek admission to college. Starting from a purpose-centered reading of the wrong statutory provision, the majority produces textualism without the text.").

Congress expressly defined an "applicant for admission" by what they *are*: a person present in the United States without having been admitted. Once a border crosser has been apprehended, released on recognizance, is living in the interior, and is merely awaiting removal proceedings, they are no longer doing anything that could plausibly be described as seeking admission. They are not presenting themselves at a port of entry, not requesting permission to enter, and not attempting to cross the border. They are simply remaining where DHS itself chose to release them.

Even accepting the Government's premise that a college applicant is one who is necessarily "seeking admission," at least while their application is pending, the analogy still fails. At most, it shows that *seeking admission* can describe a time-limited phase within applicant status, not that the two concepts are synonymous. In fact, the analogy proves the opposite. Once a student is admitted, rejected, or abandons the application—perhaps because they were accepted at a different school—they cease seeking admission, even though their status as an applicant may still be recognized for classification purposes. "Applicant" thus denotes a category; "seeking" denotes an ongoing act. Treating them as interchangeable erases the temporal limitation the analogy itself assumes.

That distinction matters even more in the immigration context. Section 1225(a)(1) assigns "applicant for admission" status by operation of law, not by voluntary action, and it does so without regard to any ongoing effort to enter the United States. "Seeking admission," by contrast, refers to an affirmative, present-oriented act. It cannot reasonably be read to persist indefinitely once the noncitizen is already in the country and no longer attempting to gain entry. Congress's decision to use both terms reflects that difference. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170 (2012) ("[A] variation in terms suggests a variation in meaning.").

This interpretation also aligns with the ordinary meaning of "or otherwise," which is defined as "something that is different from something already mentioned." *Or Otherwise*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/or%20otherwise (last visited Feb. 8, 2026). Courts recognize that "or" is "almost always disjunctive," and the inclusion of multiple, distinct statutory phrases demonstrates that Congress intended each to carry independent meaning. *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 226 (2008); *Loughrin v. United States*, 573 U.S. 351, 357 (2014). Thus, while there may be some overlap, "applicant for admission" is not necessarily a subset of those "seeking admission." Treating the two as identical would collapse the statutory disjunction and invite surplusage. A noncitizen may therefore be an "applicant for admission" under § 1225(a)(1) without "seeking admission" within the meaning of §§ 1225(a)(3) and 1225(b)(2)(A).

The title of the statute and its implementing regulations further supports this reading. Section 1225 is titled "Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for hearing." The reference to "arriving" underscores that the statute is directed at noncitizens at the border, not those already present in the interior. This focus is reinforced in the active language of the implementing regulation, which provides that "[e]xcept as otherwise provided in this chapter, any *arriving* alien who appears to the inspecting officer to be inadmissible, and who is placed in removal proceedings pursuant to [§ 1229a] shall be detained in accordance with [§ 1225(b)]." 8 C.F.R. § 235.3(c)(1) (emphasis added). Courts have recognized this language as aligned with the statutory framework, confirming that § 1225 applies to aliens seeking entry at the border rather than to those already present. *See Martinez v. Hyde*, 792 F. Supp. 3d 211, 218–19 (D. Mass. 2025).

This interpretation also aligns with longstanding constitutional principles. Noncitizens

physically present in the United States, whether lawfully or unlawfully, are entitled to greater due process protections than those stopped at the border. See *Zadvydas*, 533 U.S. at 693.[41] Congress's decision to afford discretionary detention and bond hearings under § 1226(a) reflects that distinction.[42] Congress has repeatedly shown that it knows how to impose mandatory detention when it chooses, most recently through the 2025 amendment to § 1226(c), which expanded the categories of noncitizens subject to mandatory detention under § 1226(c). The timing of this change reinforces the conclusion that, had Congress intended § 1225(b)(2)(A) to mandate detention of all noncitizens already present in the country, there would have been no need to amend § 1226(c) at all. In other words, Congress recognized the distinction between detention at the border and detention of noncitizens already in the country and deliberately chose to address only the latter through § 1226(c). "When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 589 U.S. 178, 189 (2020) (internal quotation marks omitted). "If Congress had wanted the provision to have th[e] effect [urged by the Government], it could have said so in words far simpler than those that it wrote." *Biden v. Texas*, 597 U.S. 785, 798 (2022).

The inclusion of the limiting language "seeking admission" in § 1225(b)(2)(A) therefore reflects a deliberate, narrower design. If § 1225(b) already required detention for all noncitizens

---

[41] *See also Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958) ("[O]ur immigration laws have long made a distinction between those aliens who have come to our shores seeking admission . . . and those who are within the United States after an entry, irrespective of its legality. In the latter instance the Court has recognized additional rights and privileges not extended to those in the former.").

[42] Alina Das, *The Law and Lawlessness of U.S. Immigration Detention*, 138 Harv. L. Rev. 1186, 1193 (2025) ("A closer look at legislative and regulatory history demonstrates that federal courts have largely conflated Congress's interests in exclusion and deportation with its interests in detention."); *see also* H.R. Rep. No. 104-469, pt.1, at 225 (1996) (commenting that definition of "applicant for admission" at § 1225(a)(1) was intended to "replace certain aspects" of the "entry doctrine" whereby "illegal aliens who have entered the United States without inspection [to] gain equities and privileges" unavailable to noncitizens presenting at a port of entry, explaining that it does so by making "the pivotal factor in determining an alien's status . . . whether or not the alien has been lawfully admitted," but saying *nothing* about *detention*).

who have not been admitted, provisions such as § 1226(c) would be meaningless and redundant. *Gustafson*, 513 U.S. at 574 ("[T]he Court will avoid a reading which renders some words altogether redundant."); *see also Lopez Benitez v. Francis*, 795 F. Supp. 3d 475, 489 (S.D.N.Y. 2025); *Maldonado*, 2025 WL 2374411, at *12; *Hasan*, 2025 WL 2682255, at *8. The statutory text, the timing of Congress's amendments, and the broader constitutional framework all confirm that § 1225(b)(2) was intended to govern noncitizens actively seeking admission, not noncitizens already residing in the United States.

Accordingly, a proper reading of the relevant statutory provisions compels the conclusion that Petitioners' detention is governed by § 1226(a). They were detained nearly two years after their initial encounter and release by Border Patrol, hundreds of miles from any land border. In the interim, they have filed applications for asylum, obtained work authorizations, and attended all scheduled hearings. Nothing in the record suggests that they were actively seeking admission at the time of their arrest. The Government's own records confirm as much. Petitioners were previously arrested, detained, and released pursuant to § 1226(a) on their own recognizance, a form of relief explicitly unavailable under § 1225. *See* 8 U.S.C. § 1182(d)(5)(A); *see also Martinez*, 792 F. Supp. 3d at 215 (noting that release on recognizance "does not indicate that she was examined or detained under section 1225 but instead explicitly premises her release on section 1226"). The Government points to no intervening change in facts that would justify reclassifying Petitioners' detention authority. Having once detained and released Petitioners under § 1226(a), the Government cannot now retroactively recast them as arriving "alien[s] seeking admission."

Accordingly, I find that Petitioners' detention is governed by § 1226(a). They are entitled to the procedural protections Congress prescribed, including an individualized custody

determination and the opportunity to seek a bond hearing.[43]

This ruling does not stand alone. In recent days, multiple judges of this district—including this court—have independently considered and rejected the Government's contention that 8 U.S.C. § 1225(b)(2)(A) authorizes mandatory detention of noncitizens arrested in the interior and placed into removal proceedings under § 1229a. Each court has reached the same conclusion. District courts are not advisory bodies in a hierarchical waiting room. When a district court speaks, its judgment is the law governing the parties before it. The Government remains free to seek appellate review. But it is not free to disregard uniform district authority and continue imposing custody this court has declared unlawful, treating habeas relief as a routine administrative checkpoint.

### C. Due Process

The Fifth Amendment states that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. V. "Freedom from imprisonment— from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690. The Supreme Court has emphasized that "civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Addington v. Texas*, 441 U.S. 418, 425 (1979). Further, "once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."[44] *Zadvydas*, 533 U.S. at 693; *see also Pyler v.*

---

[43] The Government's attempt to justify its actions by relying on the BIA's decision in *Hurtado* is also unpersuasive. That argument was squarely rejected by this district in *Briceno Solano v. Mason*, wherein the court observed "that the reasoning in *Hurtado* has been repeatedly rejected by the overwhelming majority of district courts that have opined on it." *Briceno Solano*, 2026 WL 311624 at *11 (citing cases). The court further emphasized that "[t]he implications of DHS's policy change cannot be understated: '[i]t has been estimated that this novel interpretation [of the INA] would require the detention of millions of immigrants currently residing in the United States.'" *Id.* (quoting *Martinez*, 792 F. Supp. 3d 211 at 218)). For these same reasons, I likewise find the Government's reliance *Hurtado* is without merit.

[44] Although Congress's power over immigration policy has been described as "plenary," *see Kleindienst v. Mandel*,

*Doe*, 457 U.S. 202, 210 (1982) ("Indeed, we have clearly held that the Fifth Amendment protects aliens whose presence in this country is unlawful from invidious discrimination by the Federal Government."); *Reno v. Flores*, 507 U.S. 292, 307 ("It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings.").

"We have always been careful not to minimize the importance and fundamental nature of the individual's right to liberty." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992). "The procedural component of due process 'imposes constraints on governmental decisions which deprive individuals of 'liberty' . . . within the meaning of the Due Process Clause.'" *D.B. v. Cardall*, 826 F.3d 721, 741 (4th Cir. 2016) (citing *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976)). Noncitizen detainees are entitled to procedural due process, which includes notice and an opportunity to be heard. *See Escobar Salgado v. Mattos*, No. 2:25-cv-01872-RFB-EJY, 2025 WL 3205356, at *22 (D. Nev. Nov. 17, 2025); *see also Cardall*, 826 F.3d at 741 (citing *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950)). These protections are in place to protect against "'the mistaken or unjustified deprivation of life, liberty, or property.'" *AARP v. Trump*, 605 U.S. 91, 94 (2025) (quoting *Carey v. Piphus*, 435 U.S. 247, 259 (1978)).

Civil detention of a noncitizen under § 1226 is subject to the three-factor *Mathews v. Eldridge* test to determine whether detention conforms with Fifth Amendment procedural due process. *See e.g.*, *Said v. Noem*, No. 3:25-cv-00938-MOC, 2025 WL 3657217, at *6–7 (W.D.N.C. Dec. 17, 2025); *Miranda*, 34 F.4th at 362. The *Mathews* test is comprised of three factors that the court must weigh: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value,

---

408 U.S. 753, 769 (1972), "it is well-established that the Due Process Clause stands as a significant constraint on the manner in which the political branches may exercise their plenary authority." *Hernandez v. Sessions*, 872 F.3d 976, 990 n.17 (9th Cir. 2017) (citing *Zadvydas*, 533 U.S. at 695).

if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335–36 (citation modified).

An individual's interest in being free from detention is "the most elemental of liberty interests." *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004). "It is clear that commitment for any purpose constitutes a significant deprivation of liberty . . . ." *Jones v. United States*, 463 U.S. 354, 361 (1983) (citing *Addington*, 441 U.S. at 425). The Government's use of § 1225 to subject Petitioners to mandatory detention certainly implicates Petitioners' liberty interest. As Petitioners note, they are currently experiencing "the gambit of deprivations that come with physical detention," which significantly include "barriers to full participation in their pending immigration proceedings, and forced imprisonment." [ECF No. 1, ¶ 41]. Accordingly, the first factor weighs heavily in Petitioner's favor.

As to the second factor, we are no longer dealing with the risk of an erroneous deprivation—one has already occurred. The Government is erroneously detaining Petitioners under § 1225, and absent intervention, they will not receive the proper process they are entitled to under § 1226. Therefore, the value of additional procedural safeguards is not speculative, and there is no reason to speak in terms of probabilities. The process under § 1226 has always been what Petitioners were supposed to receive, and the Government has failed to respect the applicable statutes so that Petitioners receive proper treatment under the law. This has prolonged, complicated, and impeded Petitioners' path to proper process with arbitrary obstacles and barriers. Thus, the second factor weighs in Petitioners' favor.

Finally, in terms of the Government's interest, Congress has repeatedly deemed immigration enforcement a "vital public interest." *Miranda*, 34 F.4th at 364. The Government's

interest in serving the public in these matters is typically "ensuring the appearance of [noncitizens] at future immigration proceedings" and "preventing danger to the community." *Zadvydas*, 533 U.S. at 690. "However, these interests would not be burdened by the individualized determination of an immigration judge as to whether Petitioner[s] should be released on bond under section 1226(a)." *Briceno Solano*, 2026 WL 311624, at *18. As Petitioners state, "the Government has no legitimate interest in refusing to follow its own rules." [ECF No. 1, ¶ 43]. It also is not clear how releasing Petitioners burdens those interests as the Government did not provide evidence indicating that Petitioners are a danger or flight risk. *Hernandez-Lara v. Lyons*, 10 F.4th 19, 33 (1st Cir. 2021) ("Limiting the use of detention to only those noncitizens who are dangerous or a flight risk may save the government, and therefore the public, from expending substantial resources on needless detention."); *see also Velasco Lopez v. Decker*, 978 F.3d 842, 855 (2d Cir. 2020) ("When the Government incarcerates individuals it cannot show to be a poor bail risk for prolonged periods of time, as in this case, it separates families and removes from the community breadwinners, caregivers, parents, siblings and employees."). Weighed against Petitioners' interests, the third factor simply does not assist the Government.

In balancing the interests under the *Mathews* test, I conclude that Petitioners' mandatory detention pursuant to § 1225 violates their procedural due process rights. "In our society[,] liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). "[T]he government's discretion to incarcerate non-citizens is always constrained by the requirements of due process." *Hernandez*, 872 F.3d at 981, 990 n.17 (2017) (citing *Zadvydas*, 533 U.S. at 695). A statutory violation is a failure to follow the law. A knowing constitutional violation is a refusal to be bound by it.

Petitioners have met their burden of proving that they are being held contrary to law.

*Walker*, 312 U.S. at 286.[45] Accordingly, Petitioners' immediate release is warranted. *See Larrazabal-Gonzalez*, 2026 WL 221706, at *5 ("There is no process to await. The Constitution requires release."); *accord Quijada Cordoba v. Knight*, No. 1:25-CV-00605-BLW, 2025 WL 3228945, at *9 (D. Idaho Nov. 19, 2025) (collecting cases of "courts across the country [that] have ordered the immediate release of detainees in similar situations" and ordering the release of a petitioner who challenged his detention without a bond hearing); *Yao v. Almodovar*, No. 25-CV-9982, 2025 WL 3653433, at *12 (S.D.N.Y. Dec. 17, 2025) (same); *Briceno Solano*, 2026 WL 311624, at *20–21 (same).

## IV.   CONCLUSION

For the reasons discussed above, and in accordance with this courts' Order entered February 5, 2026, [ECF No. 30], Respondent's Motion to Dismiss, [ECF No. 19-1], is **DENIED**, and the Petition for Writ of Habeas Corpus, [ECF No. 1], is **GRANTED**.

The court **DIRECTS** the Clerk to send a copy of this Order to counsel, any unrepresented party, and the United States Attorney's Office for the Southern District of West Virginia.

The court further **DIRECTS** the Clerk to post a copy of this published opinion on the court's website, www.wvsd.uscourts.gov.

ENTER:          February 9, 2026

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE

---

[45] Because I have found that the Government violated Petitioners' due process rights and have ordered relief accordingly, I need not address Petitioners' other claims or related arguments, including Petitioners' APA claim.